# UNITED STATES DISTRICT COURT
## FOR THE
## WESTERN DISTRICT OF KENTUCKY
### at LOUISVILLE

3:14-CV-1015-JGH

| | | |
|---|---|---|
| Chinook USA, LLC | ) | |
| 9509 U.S. Highway 42, Suite 106 | ) | **Verified Complaint** |
| Prospect, Kentucky 40059          Plaintiff | ) | **for** |
| | ) | **Breach of Contract** |
| v. | ) | **Fraud in Inducement to Contract** |
| | ) | **Fraudulent Misrepresentation** |
| Duck Commander, Inc. | ) | **Unjust Enrichment** |
| 117 Kings Lane | ) | **and** |
| West Monroe, Louisiana 71292     Defendant | ) | **Civil Conspiracy relating to** |
| | ) | **Tortuous Interference with** |
| | ) | **Contractual Relationship** |
| Serve: Registered Agent | ) | **and/or** |
| Phil Robertson | ) | **Tortuous Interference with** |
| 538 Mouth of Cypress Road | ) | **Business Opportunity** |
| West Monroe, Louisiana 71292 | ) | **and** |
| | ) | **Punitive Damages** |
| Dahlen Associates, Inc. | ) | **(where applicable to each Count )** |
| 4450 El Camino Real. | ) | |
| Atascadero, California          Defendant | ) | |
| | ) | |
| Serve: Registered Agent | ) | No. _____ |
| Rachel Daniel Dahlen | ) | |
| 900 Venice | ) | |
| Templeton, California  93465 | ) | |
| | ) | |
| 3292 Brands, LLC | ) | |
| 4450 El Camino Real | ) | |
| Atascadero, California 93422     Defendant | ) | |
| | ) | |
| Serve: Registered Agent | ) | |
| Rachael Daniel Dahlen | ) | |
| 4450 El Camino Real | ) | |
| Atascadero, California 93422 | ) | |

Go-Time Energy, LLC        )
4548 McEwen Road        )
Dallas, Texas 75201      Defendant)

Serve: Registered Agent     )
     The Corp. Trust Co.     )
     Corp. Trust Center     )
     120 Orange Street     )
     Wilmington, Delaware 19801 )
and
     C.T. Corp. System     )
     1999 Bryan St., Suite 900   )
     Dallas, Texas 75201     )

Checkered Flag Business, LLC   )
15 Sleepy Hollow Lane     )
Cincinnati, Ohio 45244    Defendant)
                        )
Serve: Registered Agent     )
     Terry Griffin     )
     10208 Crestwood Dr.     )
     Charlotte, North Carolina 28277   )

* * * * *

Comes the Plaintiff, Chinook USA, LLC. for its cause of action against the Defendants, Duck Commander, Inc., Dahlen Associates, Inc., 3292 Brands, LLC., Go-Time Energy, LLC and Checkered Flag Business, LLC. and states as follows:

## I.
## NATURE OF CASE

This Verified Complaint presents the story of a start-up company's impending financial demise, which the sworn proof will show was caused by a national corporate marketing juggernaut, who as a contract licensor, along with its licensing agents and tag-along retinue were so obsessed by self-promotion and self-gratification that they collectively became abjectly insensitive to the rights of those with whom it and they contracted.

Further, as the proof will clearly evince, sheer economic greed prompted this corporate marketing juggernaut to contract with licensing agents for the purpose of deliberately luring a host licensees from across America into a Rubix's cube-like web of license agreements. Within a year sixty-seven such licensees were consummated. As the proof will show, these licenses were consummated without regard to whether there were conflicting commitments among the licensees. But conflicting license terms made no difference to the licensing juggernaut, its agents and tag-along retinue as long as the royalty money bucket overflowed.

This obsession with exponentially growing royalty payments resulted in this corporate marketing juggernaut licensor breaching its exclusive licensing commitment to the plaintiff start-up company whose very existence and financial life was dependent upon its only licensing agreement -- the one with the licensor.

Then the licensor, its agents and tag-along retinue deliberately lured another third party licensee into a civil conspiracy under the law of Kentucky and Louisiana to tortuously interfere with the plaintiff start-up company's exclusive license contract – the details of which will be subsequently described.

It's a tragic story that in sum and substance is an example of the gross excess that 'greed-blinded' capitalism can bring when its application isn't firmly grounded in principles of fairness and legality.

In the end the proof will show that the old adage, first expressed by Sir Walter Scott in his epic 1808 poem, *Marmion*, is alive and well today –

**"Oh, what a web we weave, when first we practice to deceive"**

## II.
## PARTIES

1.      The Plaintiff, Chinook USA, LLC ("Chinook") is a Delaware limited liability company organized on November 21, 2013, with its headquarters and principal place of business being located at 9509 U.S. Highway 42, Suite 106, Prospect, Kentucky 40059.  Chinook registered with the Kentucky Secretary of State as a foreign business entity doing business in Kentucky on January 30, 2014.

   a.      Chinook was a start-up company, whose business centers around the bottling, marketing and selling what is known as "RTDs" – defined as "ready to drink" beverages, such as tea, iced tea and fruit drinks. (For a definition of "RTDs" see the License Agreement **(Appendix 8** and Footnote 8 at page 16, hereinafter).

   b.      As a start-up business, by virtue of its License Agreement with Duck Commander, Chinook's first and principal client was the Defendant, Duck Commander, Inc.

2.      The Defendant, Duck Commander, Inc. ("Duck Commander") is a Louisiana corporation organized on December 2, 1998.  Its principal place of business is 117 Kings Lane, West Monroe, Louisiana, 71292, from which its image and business is transmitted throughout the United States.

3.      The Defendant, Dahlen Associates, Inc. ("Dahlen") is a California corporation organized on January 1, 2007.  Its principal place of business is 4450 El Camino Real, Atascadero, California 93422.  At all times relative to the negotiation of the license agreement between Chinook and Duck Commander Dahlen served as the licensing agent for Duck Commander.

4.     3292 Brands, LLC ("3292") is a California limited liability company organized on January 23, 2014.  Its principal place of business is 4450 El Camino Real, Atascadero, California 93422.  At all times following its formation (which occurred several weeks after the license agreement was signed by Chinook and Duck Commander) 3292 replaced Dahlen and served thereafter as the licensing agent for Duck Commander.

5.     Go-Time Energy, LLC ("Go-Time") is a Delaware limited liability company organized on February 14, 2014, and on March 4, 2014 was registered in Texas as a foreign limited liability company with its principal place of business being 1999 Bryan Street, Suite 900, Dallas, Texas 75201, which is the office of C.T. Corporation System.  Its *actual* place of business is 4548 McEwen Road, Dallas, Texas 75244.

6.     Checkered Flag Business, LLC, ("Checkered Flag") is a North Carolina limited liability company organized on May 28, 2004.  Its principal place of business is 15 Sleepy Hollow Lane Cincinnati, Ohio 45244.

a.     However, as of the date of this litigation's filing Checkered Flag is not registered to do business in Ohio as a foreign limited liability company, even though their filings with the North Carolina Secretary of State indicates its principal place of business is in Cincinnati, Ohio.

### III.
### JURISDICTION AND VENUE

7.     The United States District Court for the Western District of Kentucky has jurisdiction over this litigation because –

a.     Pursuant to 28 U.S.C. §1332, there is complete diversity of citizenship among the parties and the amount in controversy exceeds $75,000, exclusive of interests and costs; and

b.      Further, pursuant to Kentucky's long-arm statute (KRS 454.210) this Court has jurisdiction over the Duck Commander and its agents, Dahlen and 3292, and its civil conspirator, Checkered Flag.  The statute identifies nine particular instances of conduct upon which personal jurisdiction over a non-resident defendant may be predicated.  According to a decision from the Kentucky Supreme Court, only one of the nine particular instances of conduct is required to exist in order to establish Kentucky jurisdiction over a non-resident defendant. [1]

The statute further requires that the cause of action alleged must 'arise from' the conduct identified in the statute. [2]

(1)      This Court has jurisdiction, because this cause of action arises from the following conduct that is identified in the Kentucky long-arm statute:

(a)      Duck Commander and its agents Dahlen and 3292 have repeatedly transacted business in Kentucky through Duck Commander's broad-scale national advertising and national television appearances aired into and throughout Kentucky, which was known to and utilized for Duck Commander's purposes by its agents, Dahlen and 3292.  Furthermore, Duck Commander has starred in numerous paid personal appearances in Kentucky both before and following its License Agreement with Chinook (several of which are subsequently discussed [See: pp. 10-12, and pp. 21-22 hereinafter]). The result of such numerous contacts caused Duck Commander and its agents, Dahlen and 3292, to have reasonably expected that their acts would have

---

[1]      See: *Caesars Riverboat Casino, LLC, et.al. v. Beach*, 336 S.W.3d 51, 56 (Ky. 2011) (Cited by: *Churchill Downs, Inc. v. NLR Entertainment, LLC*, 2014 U.S. Dist. *LEXIS* 71672, 05.23.14, Hon. John G. Heyburn, U.S. District Court Judge.)

[2]      The Kentucky Supreme Court has determined that the term "arise from" means (according to the Merriam-Webster Dictionary) "to originate from a source" or "to come into being from." *Id. Caesars Riverboat Casino, LLC,* at p. 58 (Ky. 2011).

consequence in the Commonwealth of Kentucky as well as within this judicial district; and because the proof will show that --

(b)    Duck Commander and its agents, Dahlen and 3292 have contracted for provision of services and the production and sale of goods from Chinook a Kentucky-based company; and because the proof will show that --

(c)    the tortuous injury to Chinook -- by Duck Commander and its agents, Dahlen and 3292; and by the breach of Chinook's exclusive licensing contract when Duck Commander initiated a license agreement with Go-Time to license 'energy shots' and with Checkered Flage to license 'vitamin water' (both which are RTDs, [ready to drink beverages] as defined in the Licensing Agreement); and by virtue of  the tortuous conduct surrounding the civil conspiracy between Duck Commander and Checkered Flag, -- each and all occurred by virtue of the said defendants' acts and omissions occurring and having effect upon Chinook both inside and outside Kentucky; and because the proof will show that --

(d)    As a result of the acts, inactions and management of the fraudulent scheme by which they have operated to cause injury to Chinook by the breach Chinook's exclusive contract and to defraud Chinook by such breach, Duck Commander's and its agents, Dahlen's, 3292's and Go-Time and Checkered Flag, and the civil conspiracy between Duck Commander and Checkered Flag that caused irreparable injury to the Kentucky-based Chinook as hereinafter described, exists to such an extent as to allow this Court to exercise jurisdiction over them; and because

(2)    Chinook's causes of action arose directly from and came into being as a result of the transaction of business in Kentucky with Chinook by Duck

Commander and its agents Dahlen and 3292 and Duck Commander's co-civil conspirator, Checkered Flag all which was supported and encouraged by Duck Commander's advertising and numerous personal appearances in Kentucky.

      (3)   Lastly, regarding the question of the application of Kentucky's long-arm statute in this case, its application does not offend the federal due process standards, which jurisdiction (under same and similar circumstances) has been upheld by numerous Kentucky and Kentucky-based federal district courts. [3]

8.    Venue is proper in this district because a significant portion of the events giving rise to the claims herein occurred in this judicial district and has caused and/or will cause reputational and other harms to Chinook in the Commonwealth of Kentucky and this judicial district.

### III.
### RELEVANT BACKGROUND FACTS
### INVOLVING
### DUCK COMMANDER [4]

### Preface

*For 40 years the Duck Commander outfit basically trudged along gradually growing their eventually graying beards and hawking their duck calls to a limited but curious segment of Americana.*

---

[3]    *Caesars, supra* at Footnote 1, 2, also clearly held that "It is a well-settled principle of law that the long-arm statute within this jurisdiction allows Kentucky courts to reach to the full constitutional limits of due process in entertaining jurisdiction over non-residents." (Citing *Poyner v. Ermq Werke*, 618 F.2d 1186 (6th Cir. 1980); *Davis H. Elliot Co., Inc. v. Caribbean Utilities Co., Ltd.*, 513 F.2d 1176, 1181 (6th Cir. 1975).

[4]    The facts subsequently discussed have been gleaned from various places, *inter alia*, (1) *Forbes* Magazine issue of 11.06.13 entitled: "Duck Dynasty's Brand Bonanza: How A&E (and Walmart) Turned Camo Into $400 Million Merchandise Sales"; (2) Duck Dynasty's Wikipedia encyclopedia Internet website and (3) DCI's counterclaim against the plaintiff, Duckhorn Wine Company, in trademark violation litigation in the U.S. District Court for the Northern District of California, *Duckhorn Wine Co. v. Duck Commander, Inc.,* et al. Case No. 13.05525 EDL. The Complaint was filed on 11.27.13 Dkt #1, Duck Commander's Answer and Counterclaim was filed on 12.18.13 Dkt #13. The case was resolved several months later by a sealed settlement agreement.

9.     In 1973, Phil Robertson, a former small-time collegiate football player, who fashions himself as the patriarch of the Robertson family, invented a simple duck call and informally founded Duck Commander for the purpose of promoting and selling them. Five years later, in 1978, he made the first commercial use of the Duck Commander trademark with its only product – the duck call device.

10.    As time passed the Duck Commander marketing brand broadened around the personalities of Phil Robertson plus his brother Si and his three sons, Jase, Willie and Jep. The Robertson men began to be portrayed to the American public as possessing honest family values that was accompanied by the ritual of dinner table family prayer. As the 1980s wore on they became more recognized when the company began producing videos featuring Phil Robertson, his duck-hunting ventures and the Robertson's long and now-graying beards.

11.    Gradually and with limited fanfare the Duck Commander 'brand' began complimenting the duck call device with other duck hunting paraphernalia that began being sold in retail and outdoor stores throughout the United States.

12.    By 2009, the Robertson family and the Duck Commander brand had further evolved into a television series called "Benelli Presents Duck Commander" that was carried on the Outdoor Channel. It lasted for several years, unspectacularly.

13.    Seeking a broader appeal that would enhance their brand and revenue stream, in 2012 the Robertson's moved to the Arts & Entertainment Channel ("A&E"), where they starred in a new series called *Duck Dynasty*, which followed the day-to-day lives of the Robertson family and their company, Duck Commander, Inc.

*"Lightning in a bottle...."*

14.    The year 2013 represented the proverbial 'lightning in a bottle' for the Robertson family and the A&E television network. Virtually overnight the Robertson family became nationally famous. The A&E television network was equally blessed as *Duck Dynasty's* 2013 fall season premier show on August 14, 2013 reportedly drew 11.77 million viewers making it the most watched nonfiction series in cable television history. [5]

a.    Yahoo reported that the Robertson men were the most sought-after costume for the Halloween celebration in 2013 and they appeared in the Macy's Thanksgiving Day Parade on national television.

b.    The Robertson men were identified by Barbara Walters as being among the "10 Most Fascinating People of 2013" and on December 18, 2013 they appeared with Walters and Pope Francis on Walters' ABC Christmas special.

c.    During 2013, the Robertson family was featured on numerous television shows such as: *Conan, the Tonight Show with Jay Leno, Late Night with Jimmy Fallon, Live! with Kelly and Michael, The Today Show, the 700 Club* and others too numerous to mention.

d.    In addition to these national television appearances, the Robertson family and its Duck Commander and *Duck Dynasty* brand became a regular staple in Kentucky performing numerous paid appearances throughout the state. [6]

---

[5]    See: Footnote 4

[6]    Upon information and belief, Chinook contends that the following list of Kentucky paid appearances only 'touches the surface' of Duck Commander's appearances in the state and that discovery will reflect many more such in person appearances, where citizens of Kentucky paid to meet and see these celebrities in their marathon marketing juggernaut.

(1)     The first known appearance in Kentucky occurred at the Eddyville First Baptist Church on February 13, 2010.   The reference is found at a website, Hunting.net **(See Appendix 1).**

(2)     On April 6, 2013, the Duck Dynasty stars appeared in the Graves County High School.  Tickets went on sale on January 26, 2013 ranging in price from $15 to $30, with VIP tickets available for $125.00 **(See: Appendix 2)**

(3)     On May 11, 2013 Willie, Phil and Si Robertson came to Murray, Kentucky and performed beginning at 6:30 pm in the Jeffrey Gymnasium of the Calloway County High School. The event is billed as: "Faith, Family and Football." 2,200 tickets were sold at a price of $60 each ($132,000) with a "meet and greet" to precede the appearance at 5:30 with a price of $125 per person. Finally, for all the 'fans' "Duck Dynasty and Duck Commander merchandise also will be sold at the event." **(See: Appendix 3)**

(4)     On March 19, 2013 it was announced in the Bowling Green *Daily News* that August 17, 2013 Phil Robertson and Miss Kay were scheduled to speak "...about their <u>business</u> and their faith, in a way only they can." [Emphasis supplied] at the Barren County High School. The *Daily News* reported: that "...the $80 tickets for meet-and-greet passes with the stars and general admission floor seating are already sold out. Still available are $50 tickets for general admission floor seating only; $35 for general admission lower level bleachers, $40 for upper chair level general admission; and $20 for general admission upper level bleachers. **(See: Appendix 4)**

(5)     On June 26, 2013, the Kentucky Tourism Cabinet announced that Willie, Korie, Si and Kay Robertson would appear on Sunday August 25,

2013 at Freedom Hall to close out the annual Kentucky State Fair. The show was titled, "A Conversation with the Robertsons" and tickets went on sale at $48 each. Without discovery it's unknown how many fans attended, or what the 'conversation' entailed, but if Freedom Hall was ½ full the gross take from tickets alone would have approached a half million dollars ($48 x 10,000 seats = $480,000) **(See: Appendix 5).**

### *Duck Dynasty becomes an 'unrestrained marketing juggernaut.'*

15.    For 40 years, the Robertson Family and Duck Commander had been simply portrayed as a manufacturer and purveyor of duck calls, related duck hunting paraphernalia – and little else. *Duck Dynasty* was not a 'household word' until the A&E Channel dynamic.

16.    Seizing upon this 'lightning in a bottle' its marketing agents, Dahlen (and later 3292), set about to dramatically broaden Duck Commander's image into an unrestrained marketing juggernaut. The promotion vehicle of choice was the concept of financially remunerative licensing agreements providing for the sale of all manner of products (colloquially known as "…from soup to nuts.") using the Duck Commander brand.

a.    In the litigation referenced in Footnote 4, this advertising and promotional effort was described in the *Duckhorn Wine Co.,* Complaint (at Paragraph 13, page 4) – as "…a marketing juggernaut selling all manner of products using the DUCK COMMANDER name." – has also included mention of ---

(1)    the publishing of three books, *The Duck Commander Family; Happy, Happy, Happy: My Life and Legacy as the Duck Commander;* and *Si-cology* – each of which wound up at the top of the *New York Times' Best Sellers* list.

b.     *Forbes* magazine reported in its November 6, 2013 issue that "By the end of 2013, *Duck Dynasty* product tie-ins will have raked in a massive $400 million in revenues according to industry sources."  Additionally *Forbes* reported that:

> "Walmart stocks 'hundreds' of the 1,200 pieces of Robertson paraphernalia now available, said a spokesperson: new *Duck Dynasty* merchandise aimed at holiday shoppers will be hitting 2,800 of their stores this week… In total…there'll be 100 brand new *Duck Dynasty* products on shelves between now and Christmas."

**(See: Appendix 6, *Forbes* Magazine 11.06.13 issue)**

17.     The net result of this "marketing juggernaut" has been the acquisition of sixty-seven (67) known entities that have contractual licensing agreements with Duck Commander.  The list is proudly carried on the Duck Commander website.  For the Court's examination, it's attached as **Appendix 7**.

## IV.
### RELEVANT BACKGROUND FACTS
### INVOLVING
### DUCK COMMANDER'S CONTRACT WITH CHINOOK
### AND ITS BREACH BY DUCK COMMANDER AND ITS AGENTS –
### DAHLEN AND 3292
### AND
### THE AIDING AND ABETTING OF THE BREACH BY
### GO-TIME and CHECKERED FLAG

**A.     Chinook ensnared in the "marketing juggernaut'**

18.     Among this marketing juggernaut's multitude of subjects was the start-up company -- Chinook. The negotiations for this License Agreement were conducted, primarily by phone and emailing, in an "off-and-on" fashion between representatives of Chinook and Dahlen, the initial licensing arm of Duck Commander. [7]

---

[7]     Dalen Associates, Inc. is located at 4450 El Camino Real, Atascadero, California 93422 and its Registered Agent is Rachel Daniel Dahlen, 900 Venice Rd., Templeton, California 93465. Subsequently Ms. Dahlen formed 3292 Brand, LLC on January 23, 2014 as a limited liability company in California, to which Chinook was required to send its royalty payments.

**B.**    **License Agreement (See: Appendix 8).**

19.    The License Agreement is dated October 28, 2013, but not signed until January 7, 2014 by an officer of Duck Commander and on January 6, 2014 by an officer of Chinook. The proof will reflect that this 70-day interregnum was primarily occupied by spasmodic communication from Duck Commander and the necessity of Chinook's incorporation and funding as a 'start-up' business.

20.    The proof will also establish that the Licensing Agreement's terms were not negotiated.  The document was prepared for Duck Commander and provided by Rachel Dahlen of the Defendant-Dahlen, Duck Commander's California-based licensing arm and basically was styled in the proverbial "take it or leave it" fashion.

        a.    The proof will establish that Dahlen applied constant pressure on Chinook to sign the License Agreement by persistent references to other companies that were willing to sign a same or similar agreement and that Dahlen was forming a marketing juggernaut and that the 'ship was leaving the dock.'

        b.    There was no negotiation or discussion with any member of the Robertson family.  The only meeting with the Robertson family consisted of a 'meet and greet' autograph occasion with Willie and Korie Robertson in September 2013.

        (1)    Interestingly, while the Robertson family's website proudly proclaims that Willie's wife, Korie, "… balances [her] family life and her role at Duck Commander with several ventures of her own including "…overseeing licensing for the family's brands…" for Duck Commander.  There has never been a discussion or a business meeting with Korie Robertson of any kind, character or description – other than this little 'meet and greet.'

c.      Importantly, there was no negotiation of any kind, character or description regarding the choice of law or choice of forum clause.

**C.      Terms of the License Agreement**

21.      Chinook was repeatedly led to believe that Dahlen had the power and authority to deliver the personal appearance portion of the License Agreement that are described in detail on Exhibit B of **Appendix 8**.  There was never – ever – any mention of the now-known fact that Duck Commander and the Robertson family has/have no control, whatsoever, over it's/their personal appearance time. It is controlled by previous contractual understandings between Duck Commander, A&E television channel and Duck Commander's advertising and promotion agency relationships.

22.      Duck Commander, as the Licensor, granted Chinook, a license for the term of five (5) years, in which Chinook obtained "… the <u>exclusive right</u> and license to use, manufacture, have manufactured, sell, distribute and advertise the Licensed Products in the Territory." **(Appendix 8, p. 1) and (Appendix 8, Schedule A, at p. 11)**

(1)      The "Licensed Properties" Duck Commander <u>exclusively licensed to Chinook</u> were Duck Commander Family Foods, Si Robertson and Uncle Si. **(Appendix 8, Schedule A at p. 10)**

(2)      The <u>exclusively</u> "Licensed Products" were "Iced tea, Ready-to-Drink (RTD) Teas, and RTD Beverages." **(Appendix 8, p. 1)** [8] **Footnote 8, below, will become of significant importance, subsequently.**

---

[8]      **Of major importance is the definition of "RTDs." The Internet encyclopedia, Wikipedia defines "RTDs" as follows: Ready to drink** (often known as RTD) packaged beverages are those sold in a prepared form, ready for consumption. This contrasts with packaged beverages that are sold in forms that require preparation, for example iced tea (which can also be prepared using tea leaves and fruit juice) and "alcopops" (which can be prepared by mixing alcoholic beverages with fruit juices or soft drinks).

(3)     The "Territory" is defined as United States, Canada, Mexico, South America, Caribbean, EU and Australia.  **(Appendix 8, Schedule A at p. 10)**

23.     For the privilege of doing business with Duck Commander, Dahlen exacted significant "Royalties" from the 'start-up' Plaintiff, Chinook, *inter alia*:

(1)     Royalty Rates on the Net Sales Value [9], to be paid upon Net Sales as follows:  **(Appendix 8, Schedule A at p. 10)**

        (a)     4.5% on the first 0-$20 million dollars
        (b)     5.0% on sales between $20 - $50 million dollars
        (c)     5.5% on sales between $50 - $100 million dollars
        (d)     6.0% on sales above $100 million.

(2)     An advance payment within five days of the License's execution of $250,000; and

(3)     A "Guaranteed Minimum Royalty of $1,000,000 annually for each year of the five-year contract" with payments being made in quarterly installments of $250,000

(4)     Chinook was initially responsible to "…launch the Duck Commander Ice Tea program with a personal endorsement fee for Si Robertson ("Uncle Si") of $1,000,000.   Payable in year one in quarterly installments of $250,000."

**(Appendix 8, Schedule A at p. 11)**

24.     Schedule B, Item 14, which is the final page of the License Agreement was not a part of the original draft proposed by Duck Commander's licensing arm, Dahlen.  The differences in font, type size and the style between the License Agreement and its Schedule A *and Schedule B* are clearly visible. The reason for those differences is

---

[9]     Net Sales Value defined as "…the gross invoice price billed to customers less value added tax and other sales taxes included within the price, as well as Allowable Deductions" [which are nowhere defined],

that Chinook required Schedule B to be added to the final License Agreement, because Chinook deemed the 5 "content development steps" as being critical in its ability to establish the brand for Si's Iced Tea -- especially – as noted – for "Year One." As a result, in return for the exacting of these royalty fees described in ¶23, above, Duck Commander committed to a series of "content development" steps "…to help launch, promote and grow the Iced Tea brand." **(Appendix 8, Schedule B at p. 12)**

(1)   One Photo Shoot in the first six months – to be done in Monroe, Louisiana and not to last more than four hours; and

(2)   Media Interviews in the first six months: Up to 10, 15 minute interviews; and

(3)   Commercial Shoots: One shoot in the first year of the License Agreement to occur in Monroe, Louisiana; and

(4)   Special Appearances: One each quarter "…to be decided upon by Si and Korie and Willie Robertson based on their assessment of which events will be the most impactful and workable for Si…."; and

(5)   Planning Meetings: Two meetings, annually with Robertson family members. Additional meetings will be handled by the Dahlen team.

25.   Of the five "content development steps' mentioned in ¶24 above and found at **Appendix 8, Schedule B at p. 12, --- *only one was ever fulfilled***, to-wit: photo shoots were taken of Si Robertson in late March and sometime in April of 2014, which were necessary in order to have a 'picture' of Si Robertson on the label of the "Si's Iced Tea" and a video to use in its promotion.

a.   This default occurred, despite the fact of a continual effort on the part of Chinook personnel to encourage these "content development steps" because it were deemed them critical to Chinook's ability to market and sell "Si's Iced Tea."

b.      As far as Chinook was concerned **the most critical of the**

**"content development steps"** was the fifth listing – to-wit: two annual meetings with the

**Robertson family (itself).** *They never occurred.*

26.      Over the next eleven months Chinook made the following payments to

Duck Commander ---

| Date | Payor | Payee | Amount | Purpose |
|------|-------|-------|--------|---------|
| 01.13.14 | Megan Prop. | Dahlen Associates | $ 250,000 | Advance Royalty Fee |
| 02.18.14 | Megan Prop. | Duck Commander | 1,000,000 | Texas 500 Sponsor |
| 07.07.14 | Chinook | 3292 | 250,000 | Uncle Si Endorsement |
| 10.14.14 | Chinook | 3292 | 250,000 | Uncle Si Endorsement |
| Total | | | 1,750,000 | |

***Examples of Duck Commander's failure to honor the***
***5v'content development steps' to support Chinook's commitment to market***
***"Si's Iced Tea" for Duck Commander***

27.      As this list of payments in ¶26 (above) reflects that within the first 5

weeks of the License Agreement' execution, Chinook paid Duck Commander $1,250,000

-- $1,000,000 of which was paid on February 18, 2014 to finance Duck Commander's

sponsorship of the Texas 500 NASCAR (to be called the "Duck Commander 500") race

in Arlington, Texas on Sunday April 6, 2014, even though Exhibit A to the License

Agreement provided for a 'product introduction date' of April 30, 2014.

a.      The Duck Commander 500 'hustle' of Chinook's $1,000,000

payment began within a month of the License Agreement's signing. Email

correspondence dated February 6, 2104 indicates that upon being advised by Dahlen of

the Texas 500 NASCAR sponsorship, representatives of Chinook requested:

> "...a detailed plan for the event and the national PR.... For
> example, network TV and other national media ....We
> would like to see the plan ASAP so that we can better
> understand all the media and interactive opportunities
> associated with the event."

Three days transpired without response, so on Sunday, February 9, 2014, by email to Dahlen Chinook's CEO requested a meeting, stating:

> "Our board of directors needs specific details before we can finalize approval of this spending and sign an agreement. To date, we have only received information on track level activities. There are many details that we need to work through. We have not been presented with any specifics regarding Duck Commander's plans to drive the success of the Uncle Si's Iced Tea launch and the event. These items are extremely important and we would like to see them ASAP – standard sponsorship data such as benefits, impressions, return and expected sales."

b.     The meeting occurred on February 13, 2014 and was attended by Rachel Dahlen and David Bolls ("Bolls") representing Duck Commander and Chinook's CEO, David Salmon, its COO and Chairman of the Board, Paul Cox and its V.P. of Marketing, Mark Gunderson. At this meeting a White Board presentation ("White-Board Meeting") was made by Dahlen and Bolls. A picture was made of that White Board and it's attached as **Appendix 9**.

c.     At this meeting Dahlen and Bolls represented that there would be "National Outreach," signage on the track, a press release, presence of the Robertsons and national television appearances on Good Morning America, the Today Show and Fox & Friends.

d.     On the basis of this presentation and commitment, five days later on February 18, 2014, Chinook wrote a $1,000,000 check to Duck Commander for the purpose of the its co-sponsorship of the Texas 500 NASCAR race.

28.     During this meeting Dahlen and Bolls, on behalf of Duck Commander, insisted on a April 5th product introduction date (for "Si's Iced Tea") despite the fact that

Chinook wasn't provided the opportunity to even take a photo of Si Robertson to be used on the paper wrap around the plastic bottle until late March of 2014. (See: ¶21)

        a.      In accordance with the February 13, 2014 White-Board Meeting Chinook requested information as to when Si Robertson was scheduled make the appearances on nationally televised shows (the "Today Show" on NBC or the "Morning Show" on CBS and Fox & Friends) to promote his iced tea, prior to the April 6, 2014 NASCAR race.

        (1).     Duck Commander's response: "Si's not available."

--------------------

*A small aside (intervenes at this point)*
*in the form of an unknown fact (at the time),*
*but turned out to be a rather ignominious*
*Valentine present for Chinook*

    29.    Unbeknownst to anyone at Chinook, on Valentine's Day 2014, one day after the February 13, 2014 "White-Board Meeting," a limited liability company was formed in Delaware – "Go-Time Energy, LLC"!!!  On March 4, 2014 it registered with the Texas Secretary of State as a foreign limited liability company.  As will be later noted – this quiet little event was to represent (what turned out to be one of several breaches of Chinook's **exclusive License Agreement with Duck Commander**.

*Now – returning to the chronological events*

--------------------

    30.    To compound Chinook's difficulties with Duck Commander and its agent, Dahlen, the NCAA Final Four basketball tournament was scheduled for the Dallas Cowboy's Stadium for the *same* weekend as the Duck Commander 500 at the Texas Motor Speedway.  It was also anticipated by most basketball aficionados that the

University of Kentucky's men's basketball team would be in the NCAA Final Four. They were – and after winning their semi-final game on Saturday they played in the Championship game on Monday night April 7th. It was widely publicized that over 25,000 Kentuckians would attend <u>and did</u> attend the championship game weekend.

      a.     To Chinook's knowledge there was no mention during the NCAA tournament in Dallas of Kentucky-based Chinook or its $1,000,000 sponsorship of Duck Commander 500 NASCAR Race **OR** Si's Iced Tea, nor was there any promotion of Si's Iced Tea at the NCAA games by Duck Commander.

      b.     Finally, to compound the difficulties with the NASCAR sponsorship, which Chinook paid $1,000,000 to co-sponsor, the race was rained out on Sunday the 6th of April and was moved to Monday – to be concluded by 3:00 pm in the afternoon – so as to not conflict with the NCAA national basketball championship featuring the Universities of Kentucky and Connecticut. The television audience for the early Monday afternoon April 7th NASCAR race was abysmal (as would be expected).

### *But another Duck Commander breach of the License Agreement occurred during the first several months, which was to be even more confounding*

31.     Southeast Christian Church in Louisville, Kentucky has become recognized as a mega-church, with over 30,000 members. It is the largest church in Kentucky and the 5th largest in the United States, with a weekly attendance over 22,000.

      a.     On January 27, 2014 (twenty days after Duck Commander signed the License Agreement with Chinook) Southeast Christian Church began ticket sales for an April 11, 2014 appearance of the Duck Dynasty stars (<u>one week after the Texas 500</u>

NASCAR race. Until discovery occurs it will be unknown when discussions between Southeast Christian and Duck Commander began.

b.      Among the four members of the Robertson family who were to appear at Southeast Christian was Si, who was the Robertson that was directly associated with the exclusive rights granted to Chinook for "Si's Iced Tea, because his picture appears on the iced tea bottle. **(See: Appendix 10, for a copy of the announcement)**

c.      This event represented a unique opportunity in Chinook's **hometown** for Duck Commander to honor its *supposed intent* in its License Agreement with Chinook, but Si Robertson was at Southeast Christian Church in Louisville without any 'tie-in' with the Louisville-based Chinook USA.

d.      Even though Chinook's only business office is located less than five (5) miles from Southeast Christian Church, Chinook was never made aware of this Duck Commander appearance at this mega-church and was never invited to participate in the event; and, to its knowledge, there was never a reference of any kind to Chinook during the event. By the date of this Southeast Christian Church appearance (within 3 months of the License Agreement's signing), Chinook had written checks totaling $1,250,000 to Duck Commander and had seen Si Robertson once – when he and a photographer met to take his picture to be used on the Iced Tea's paper wrapper!!!!!!!!

*This gross inattention to its License Agreement commitments*
*by Duck Commander*
*was compounded*
*by an even more confounding breach of the License Agreement*

**D.     Facts relating to an additional breach by Duck Commander's of the License Agreement's exclusivity provisions.**

32.     Early in the summer of 2014 the Chairman of Chinook's Board of Directors, Paul Cox ("Mr. Cox") began expressing concern over the financial distress Chinook was experiencing due to lagging sales of Si's Iced Tea.

a.     The executive staff of Chinook responded to this concern by explaining that Duck Commander was not honoring its 5 "content development steps" it had committed to in Schedule B of the License Agreement.

b.     The members of the Board initiated a more active involvement in the day-to-day affairs of Duck Commander's performance under the License Agreement.

33.     Following Chinook's October 14, 2014 payment of another $250,000 to Duck Commander, Chinook's COO and Chairman of its Board, Mr. Cox, began insisting on a meeting with Duck Commander officials.

a.     On November 6, 2014 Mr. Cox, Mr. Frankenberger and Chinook's CEO, David Salmon ("Mr. Salmon"), met with representatives of Duck Commander in Monroe, Louisiana. The purpose of the meeting was to discuss the possibility of a resolution to the financial plight Chinook was experiencing due to Duck Commander's continuing breach of their 5 *content development steps* listed in Exhibit B of the License Agreement.

b.     During the meeting, after complaints were discussed by Messrs. Cox, Salmon, and Frankenberger about the failure of Duck Commander to provide the content development, media interviews, and special appearances described in Schedule B, Item 14 of the Agreement, which the Agreement itself specifies "is critical to help launch, promote and grow the Iced Tea brand", Duck Commander General Manager Kyle

Tengwall asked, "What did we agree to?"

        (1)    After being advised of Duck Commander's 5 *content development step* commitments in Exhibit B, Mr. Bolls stated unequivocally that Duck Commander "…. had no control over the activities of the Robertson family while they were filming their series." That A&E was in full control of the family's activities, and that while the family got days off occasionally, no one knew in advance when these days would occur until the day before.

        c.    Also attending the lunch portion of the meeting the same day, at Duck Commander's invitation, was an individual by the name of Leon, who was introduced as someone who might be willing to make a financial investment in Chinook.

        (1)    Nothing ever came of this individual – but there was soon to be another fraudulent 'gambit' – to be discussed subsequently – which results in several additional Counts in this Verified Complaint.

        d.    At the November 6, 2014 meeting he Duck Commander representatives made various promises as to better performance and more attention to Duck Commander's commitments for the purpose of soothing the growing concerns of Chinook's Board members -- Messrs. Cox, Frankenberger and Salmon.

        e.    The meeting began with Messrs. Cox, Frankenberger and Salmon taking a 'tour' of the Duck Commander Country Store – where all the Duck Commander items (previously referenced as being from "…soup to nuts…." were hawked.

---

*[Momentary aside]*

34.    In the 1940s the actor, William Bendix, starred in a radio show that was recast in the 1950s as a television show starring Jackie Gleason. The show was called: "The Life of Riley." The Bendix and Gleason character was riveter in an aircraft plant with the name - Chester A. Riley.   Riley led a paradoxical life full of shocking frustrations.  His retort about those frustrations turned into one of early television's most memorable phrases - "What a revoltin' development this turned out to be."

---

35.    Up to that point, no 'development' in the Chinook/Duck Commander 'country square dance' was more 'revoltin' than the Chinook representatives' trip to the Duck Commander 'company store.'  There in *bas-relief* was a prominent display of a "RTD" (Ready to Drink) item that was produced by Go-Time Energy of Dallas, Texas and entitled "Duck Commander "Go-Time Energy Shot" in various flavors. **Appendix 12 is a** picture reflecting three of the flavors: "Ragin Grape," "Buckshot Berry" and "Happy, Happy, Happy Orange."

a.    Of course – this is the same Go-Time Energy, LLC that was formed on Valentine's Day in 2014 and was described as a "Valentine's Day present" for Chinook.  See ¶29, above.

b.    Footnote 8 at page 15, hereinabove, defines an "RTD" – and, of course, Chinook had an **exclusive License Agreement for RTDs where the term was also described**.  But there it was – in all its ignominy – on a shelf in the company store of Duck  Commander  --  the  bearded  Christian/family  life  $400,000,000  marketing juggernaut – an RTD for sale to the masses --- in complete and utter violation of Duck Commander's License Agreement with Chinook.

      c.     Thus, Chinook's <u>exclusive License Agreement for RTD's</u> had been unquestionably breached, because Article 22 of the License Agreement states in pertinent part as follows:

> **22. Integration**
> This Agreement constitutes the entire understanding of the parties . . . .and is intended as a final expression of their Agreement. **It shall not be modified or amended except in writing signed by the parties hereto and specifically referring to this Agreement. THIS AGREEMENT SHALL TAKE PRECEDENCE OVER ANY OTHER DOCUMENTS WHICH MAY BE IN CONFLICT WITH SAID AGREEMENT**....

      d.     Thus, whatever agreement that was entered into between Go-Time and Duck Commander to permit Go-Time to produce and market energy shots, was a direct and intentional breach of Chinook's License Agreement – which never been amended in accordance with the strict requirements of its Integration clause.

*One final "revoltin' development" that takes the proverbial 'cake'---*

*there exists at least one other identical contractual breach to that of Go-Time that is also*
*accompanied by further fraudulent behavior on the part of Duck Commander*

## V.
## RELEVANT BACKGROUND FACTS SURROUNDING
## DUCK COMMANDER'S CIVIL CONSPIRACY WITH CHECKERED FLAG TO
## TORTUOUSLY INTERFERE WITH CHINOOK'S EXCLUSIVE LICENSE AGREEMENT OR TO
## INTERFERE WITH CHINOOK'S BUSINESS ADVANTAGE EMANATING FROM ITS LICENSE AGREEMENT WITH DUCK COMMANDER

      36.     At the same November 6, 2014 meeting where the representatives of Chinook discovered the Go-Time energy shot, which represented a breach of its exclusive License Agreement, because an 'energy shot' is an RTD, another set of events

were placed in motion that have become not only a breach of Chinook's contract, but also represent two additional Counts in this litigation.

37.     As previously indicated, the primary purpose of Chinook's meeting on November 6, 2014 was to discuss with Duck Commander representatives the possibility of providing relief in the form of a reduction of, or a moratorium on, the licensing fees (minimum royalty) and the "personal endorsement fee for Si Robertson" which Chinook had already paid $500,000 -- for the simple reason that Duck Commander had violated every "content development steps" that Chinook insisted upon and were contained in Schedule B which Chinook had insisted be added to the License Agreement. (See: page 17, hereinabove for their description). Among the Duck Commander representatives at the November 6, 2014 meeting was Kyle Tengwall ("Mr. Tengwall"), who is referenced as the General Manager of Duck Commander.  At the November 6th meeting Mr. Cox discussed with Mr. Bolls and Mr. Tengwall Duck Commander agreeing to provide relief to Chinook in the form of a reduction of, or a moratorium on, the licensing fees (minimum royalty) and crediting the $500,000 Chinook had paid Duck Commander for endorsement activities for which it had received none, and an extension of 5 years to the Licensing Agreement in order to assist Chinook in securing additional investors

37.     In early December 2014, (nearly a month after the November 6th meeting) Mr. Cox and Mr. Frankenberger, received an email from Mr. Tengwall. Instead of being responsive to Mr. Cox's Term Sheet, Mr. Tengwall suggested that Messrs. Cox and Frankenberger talk with Terry Griffin ("Mr. Griffin") of Checkered Flag to see if "we could work out something."

### *December 5, 2014 meeting between Chinook and Checkered Flag Officials*

38.     The initial meeting with Mr. Griffin was on December 5, 2014.  It was basically introductory in nature.  Mr. Griffin explained his background in the beverage business and that he lived in Charlotte but conducts business in Cincinnati for Checkered Flag.  He explained that six of his friends in Charlotte are shareholders of Checkered Flag.    Thereupon a colloquy occurred between Mr. Griffin and Mr. Cox regarding Chinook --- how the company was structured, how much money Mr. Cox had invested, etc.  Mr. Griffin explained that he had recently met with some Kroger buyers who advised him that Chinook had called on them to try to sell them Si's Iced Tea – but had been turned down by Kroger because Chinook had "… no plan, no strategy, and no experience in the RTD industry.  Mr. Griffin continued by advising Mr. Cox that he had a 10-year long running personal relationship with Duck Commander's, Mr. Tengwall and that he had explained to Mr. Tengwall that, in his opinion Duck Commander was hurting itself by licensing to many products and trinkets to too many different companies and that it was sad to walk through their retail store in Monroe and see all the junk they've licensed.

39.     Then Mr. Griffin stunned the meeting by asserting that he had negotiated a licensing agreement with Duck Commander for what he described as a "health drink", commonly referred to as 'vitamin water', that contained various supplements.  Mr. Griffin went on to explain he had been advised by Duck Commander that Chinook had spent $4+ million, was out of funds, had substantial inventories of Si's Iced Tea it couldn't sell, and its salesmen - namely one David Salmon was an inept and ill equipped RTD salesman.

40.     Further, Mr. Griffin also explained that Checkered Flag is bringing other Consumer Product Goods ("CPG's") to market including a granola bar,

41.     Then Mr. Griffin presented a plan wherein Mr. Cox "...could get his money back" and that Checkered Flag would be interested in working out "a deal" with Mr. Cox -- **NOT Chinook USA** – that would help Mr. Cox get his money back. Mr. Griffin advised Mr. Cox that he was aware of the fact that Duck Commander was preparing to terminate Chinook's exclusive license agreement for all RTD products and reassign the agreement to Checkered Flag, and this is the reason why Mr. Tengwell suggested that he meet and discuss a way for Checkered Flag and Mr. Cox to work together.

a.     Mr. Griffin explained that Checkered Flag would take over the Chinook contract and reinvent it with a new "billboard" type label; and that Chinook would liquidate all its existing inventory OUT OF THE COUNTRY so as not to ruin the market.  Then Mr. Griffin suggested that Mr. Cox would provide $350,000 of capital to get Si's Iced Tea re-started under the auspices of Checkered Flag.  If Mr. Cox would do that, then Mr. Griffin indicated that Duck Commander would give Checkered Flag 12 to 18 months of operation without ANY fees.  In return, Checkered Flag would give Mr. Cox priority on its profits until Mr. Cox recovered his $350,000 capital infusion into Checkered Flag, whereupon Mr. Cox would own from 2% to 5% of Checkered Flag moving forward.

b.     A few days later, Mr. Griffin sent a confirming email to Mr. Cox of his offer that was agreed to by Duck Commander.

***December 19, 2014 meeting between Chinook and Checkered Flag Officials***

42.    On Friday, December 19, 2014, Mr. Cox and Mr. Frankenberger returned to Cincinnati to meet with Mr. Griffin of Checkered Flag.

a.    The meeting began with Mr. Frankenberger asking if Checkered Flag had a contractual license agreement with Duck Commander for vitamin water, to which Mr. Griffin responded -- "Yes."

b.    Then Mr. Frankenberger asked Mr. Griffin -- "Since you now know that Chinook has an exclusive agreement with Duck Commander for ALL RTDs, did Checkered Flag ask for or receive any copies of documentation or any form of confirmation or authorization that Duck Commander had the legal right to license vitamin water to Checkered Flag the rights to vitamin water".

c.    Before Mr. Griffin responded, Mr. Frankenberger read aloud several e-mail correspondences between Chinook staff and Duck Commander and/or 3292 staff, which displayed that while 3292 had requested Chinook sign an amendment to its License Agreement Chinook HAD in fact REFUSED to execute it or alter or modify its License Agreement with Duck Commander in any way.

d.    Then, Mr. Griffin, matter-of-factly stated,

"*It doesn't matter. You see, Duck Commander is going to terminate Chinook's License Agreement based upon a default by Chinook. So, even if you catch up your license fee payments to Duck Commander, they know Chinook is going to fail. Your approach to the market is all wrong. We can wait. If it takes 30 days or 6-8 months, we can wait. Actually I've discussed with Kyle [Mr. Tengwell] and he agrees, that all CPG's should be put under one roof, and that's where Checkered Flag and Duck Commander are headed.*"

43.    Mr. Griffin continued with some substantially modified proposals for Mr. Cox to participate with Checkered Flag "in order to get his money back," but definitively

30

NOT via Chinook USA LLC.  He specifically stated:

"all this would be under Checkered Flag."

44.     Before Messrs. Cox and Frankenberger arrived back in Louisville, Mr. Griffin had e-mailed a "Term Sheet" to Mr. Cox for his consideration.

45.     Therefore, Messrs. Cox and Frankenberger were placed in a position by Mr. Griffin of Checkered Flag that Checkered Flag and Duck Commander had united for the purposes of placing all Duck Commander's CPG's under Checkered Flag's control and the Chinook License Agreement was going to be terminated for non-performance, even though the License Agreement had been breached by Duck Commander.

**This "revoltin' development" – a complete breach of Chinook's "exclusivity rights' coupled with a civil conspiracy between Duck Commander and Checkered Flag was the proverbial final straw that broke The camel's back**

———————

As was stated 28 pages ago -- in the end the proof will show that the old adage, first expressed by Sir Walter Scott in his epic 1808 poem, *Marmion*, is alive and well today –

**"Oh, what a web we weave, when first we practice to deceive"**

———————

**the proof and this end has resulted in the following Counts**

**COUNT I**

**BREACH OF EXPRESS CONTRACT**
**by**
**Defendant, Duck Commander**

46.     The allegations contained in paragraphs 1- 45 are incorporated as if fully set forth in this Count I.

47.     Pursuant to the allegations contained at Paragraphs 1-45 *et.seq* and Appendices 1-11 of this Verified Complaint, Chinook possessed an exclusive 5-year License Agreement with Duck Commander, under the laws of both Kentucky and Louisiana, for Duck Commander's promotional support that is described in a <u>specific form and format (more fully described in Exhibit B of the License Agreement as "content development steps")</u> in return for Chinook's payment of substantial royalties along with its preparation, marketing and sale of RTDs – and specifically -- Si's Iced Tea.

48.     Furthermore, the Integration clause (¶22 of the License Agreement) mandates that the only permissible means of amending the License Agreement (which includes its exclusivity) shall be by a "…writing signed by the parties hereto and specifically referring to this Agreement. This Agreement shall take precedence over <u>any other document which may be in conflict with said Agreement."</u>

49.     Despite the specific mandates contained in the Integration clause, the proof set forth in this Verified Complaint and that will be presented to this Court clearly indicate that Duck Commander breached the exclusivity clause by contracting with Go-Time and with Checkered Flag to produce and market RTDs without amending the License Agreement in accordance with the Integration clause and the specifics required, therein.

50.     Chinook has paid royalties (in accordance with the terms of the License Agreement through the October 14, 2014 payment) to Duck Commander in the sum of $1,750,000. (See: ¶ 26).

51.  However, as of the October 14, 2014 Chinook payment, Duck Commander has provided only one of the five "content development steps' listed in ¶ 24, hereinabove.

52.  Under longstanding Kentucky law an express contract may be written, oral or implied-in-fact as determined by the conduct of the parties. A written express contract is formed by the existence of four (4) elements, namely: (1) the parties must have the capacity to enter into a contract, (2) the parties must manifest their intent to be bound by the contract, (3) the enforceable contract must have a legal purpose and (4) there must be valid and sufficient consideration.

53.  The proof establishes that an express written contract all the terms and conditions between the parties are set forth in the License Agreement. (*Dorton v. Ashland Oil Ref. Co.*, 197 S.W.2d 274 (Ky. 1946))

    a.  There can be no question that both parties had the capacity to enter into the License Agreement.

    b.  Nor can there be a question that when Chinook signed the License Agreement it intended to be bound by it.  Whether Duck Commander intended to be bound can only be established by the taking of proof, but their actions following the signing of the License Agreement clearly establish that it violated the exclusivity granted to Chinook.

    c.  There can be no question that the purpose of the License Agreement was legal and that there existed valid and sufficient consideration – under Kentucky law.

      d.    Under Kentucky law there can be no question that the exclusive terms of the License Agreement have been violated by the conduct of Duck Commander as described in ¶¶s 1-45, above, by Duck Commander's failure to honor the "content development steps" contained in Schedule B <u>and</u> by permitting Go-Time and Checkered Flag to produce and market RTD's without a written amendment to the License Agreement in accordance with its Integration clause.

54.    Under the Louisiana Civil Code:

      a.    a "… contract is formed by the consent of the parties established through offer and acceptance." *La. Civ. Code. Ann. Art. 1927.*

      (1)    Clearly, under Article 1927 of the Louisiana Civil Code the License Agreement is a contract containing an offer and acceptance by both Duck Commander and Chinook and all the terms and conditions of the offer and acceptance between the parties are set forth.

      b.    the requisite "consent may be vitiated by error, fraud or duress." *La. Civ. Code. Ann. Art. 1948.*

      (1)    Clearly, under Article 1948 of the Louisiana Civil Code the *least* that can be said about the damage created upon Chinook by Duck Commander, which has been set forth in ¶¶1- 45 involved "error" (multiple mistakes of Duck Commander) and "duress (being a 'take-it-or-leave-it" License Agreement.)"

55.    Under Louisiana law there can be no question that the exclusive terms of the License Agreement have been violated by the conduct of Duck Commander in awarding license agreements to Go-Time and Checkered Flag to produce and market RTDs without a written amendment to the License Agreement in accordance with its

Integration clause <u>and</u> by Duck Commander's failure to honor the "content development steps" contained in Schedule B.

56.    In summary, Duck Commander knowingly and intentionally undertook a series of actions and inactions that are described in Paragraphs 1- 45, *et.seq* to breach this contractual understanding under the laws of both Kentucky **and** Louisiana.

57.    As a direct and proximate result of the breach by Duck Commander, Chinook has suffered material and substantial damages, including *inter alia*, the $1,750,000 it has paid to Duck Commander as set forth in ¶26 above <u>and</u> the additional financial loss it has experienced all totaling in excess of $4,500,000. The exact amount of Chinook's financial loss as a result of Duck Commander's contractual breach will be determined at the trial of this case including additional costs, expenses and losses incurred as a result of the breach and the requirement to enforce its breach in court.


**COUNT II**

**PUNITIVE DAMAGES**
**FOR FRAUD INDUCEMENT TO CONTRACT**
**UNDER THE LAW OF KENTUCKY**
**as against**
**Defendant, Duck Commander**

58.    The allegations contained in paragraphs 1 through 57 are incorporated as if fully set forth in this Count II.

59.    Kentucky law on the fraudulent inducement to contract requires: (1) a material representation, (2) which is false, (3) known to be false OR made recklessly, (4)

made with inducement to be acted upon, (5) acted in reliance thereon, and (6) causing injury and/or damage. [10]

   a.  Chinook has asserted facts in paragraphs 1- 57 that clearly set forth the reality that Duck Commander's representations concerning the "content development steps" were <u>material</u> to Chinook's decision to enter into the License Agreement – yet they were false or they were recklessly made, because Duck Commander did not control its ability to offer its appearances and the appearances of the individual members of the Robertson family – nor, did Duck Commander <u>ever</u> advise Chinook of this lack of control over it's scheduling – nor did Duck Commander <u>ever</u> suggest a procedure Chinook could use to effectuate the scheduling required in order for Duck Commander to comply with the "content development steps" contained in Exhibit B of the License Agreement.

   b.  In fact, control over the schedule of appearances and timing for appearances of Duck Commander and the members of the Robertson family, including Si Robertson had been previously placed in the control of A&E and its licensing arm, Dahlen Associates, Inc. of California and Ebie Media, a publicist located in Nashville.

   c.  At the time Duck Commander made these representations to Chinook, it knew the Robertson family members would be unable to meet the "content development steps" contractual commitment and thus made these commitments recklessly and failed to exercise reasonable care in communicating this information to Chinook.

---

[10]  *United Parcel Service Co. v. Rickets*, 996 S.W.2d 464, 468 (Ky. 1999) (citing *Wahba v. Don Cortlett Motors, Inc.*, 573 S.W.2d 357, 359 (Ky. Ct. App. 1978).

d.    These misrepresentations by Duck Commander were material in that Chinook relied upon the truth of these representations unknowingly, to their detriment.

60.    Under the long-established law of Kentucky damages are available for the breach of a contract in an amount of the value of the contract that was breached and, in addition, punitive damages are also awardable against the defrauding party as a punishment for the fraudulent inducement of the contract that the defrauding party has breached. [11]

a.    The recent case of *Ventas, Inc. v. Health Care Prop. Investors*, 2009 U.S. Dist. LEXIS, 45620, *aff'd* 647 F.2d 291 (6th Cir. 2011) *cert denied* 132 S.Ct. 572 (2011) is noteworthy. In *Ventas* U.S. District Judge for the Western District of Kentucky, Hon. John G. Heyburn, opined that a fraudulent misrepresentation: "… must be of an objective fact…" necessarily tempered in that "… a future promise is [still] actionable [in fraud] if the speaker never intended to act." The objective facts surround the fraudulent misrepresentations in the instant case are legion as is the fact that the promisors never intended to act nor did they have the capability to act – because Duck Commander did not control the time of the Robertson family when the License Agreement was consummated.

---

[11]    See: *Davis v. Siemens Medical Solutions, USA, Inc.*, 399 F.Supp. 2d 785 (W.D.Ky. 2005); *Schoerlucke v. Hall*, 249 S.W.2d 130 (Ky.App. 1952), *Moseley v. Owensboro Municipal Housing Comm.*, 252 S.W.2d 880 (Ky. 1952) and *Hanson v. American Nat'l Bank & Trust Co.*, 865 S.W.2d 302 (Ky. 1993) where Justice Leibson wrote: "The idea that any person or industry or enterprise would be immune from liability for fraud and deceit is not acceptable." This quote was cited by Judge Heyburn in *Davis, supra.*, and it should be further noted that Judge Heyburn's decision in *Davis, supra*, was affirmed by the Sixth Circuit at 279 Fed.Appx. 378 (6th Cir., 2008) and *certiorari was denied* by the U.S. Supreme Court at 555 U.S. 171 (2009).

61.     Consequently, Chinook is entitled to punitive damages under the law of Kentucky for Duck Commander's fraudulent inducement to contract with Chinook and promise "content development steps" when, in fact, Duck Commander had no ability to honor that contractual commitment – because they had already contracted *away* that ability to other entities.

62.     Thus Chinook is entitled to be awarded a verdict by a jury on Count II in an amount to be determined by that jury in the form of punitive damages under the law of Kentucky for their fraudulent inducement to entice Chinook to enter into the License Agreement with no ability to honor their "content development steps" which resulted in their subsequent breach of their contract with the Plaintiffs.

## COUNT III

### FRAUD UNDER THE LOUISIANA CIVIL CODE
### *as against to Defendant Duck Commander*

63.     The allegations contained in paragraphs 1 through 62 are incorporated as if fully set forth in this Count III.

64.     As averred in Count I at ¶54(b) in Louisiana the requisite "consent may be vitiated by error, fraud or duress." *La. Civ. Code. Ann. Art. 1948.*  Count I proceeded to discuss the vitiation of Chinook's 'consent' to contract by 'error' and 'duress.'

65.     By Count III, Chinook asserts that Duck Commander also committed 'fraud' under the Louisiana Civil Code in its offer to Chinook to entice Chinook's acceptance of the License Agreement.

66.     *La. Civ. Code Ann. Art. 1948*, reads in pertinent part – "Fraud is a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other."

Additionally, *La. Civ. Code Ann. Art. 1953* reads – "Fraud may also result from silence or inaction."

    a.    *La. Civ. Code Ann. Art. 1954* qualifies the reality of a fraud, as follows: "Fraud <u>does not</u> vitiate consent when the party against whom the fraud was directed could have ascertained the truth without difficulty, inconvenience or special skill." [Emphasis supplied]

67.    Under Louisiana law, an action for fraud against a party to a contract requires (1) "...a misrepresentation, suppression, or omission of true information"; (2) "the intent to obtain an unjust advantage or to cause damage or inconvenience to another;" and (3) that the error induced by the fraudulent act relates to a circumstance that substantially influenced the victim's consent to the contract." [12]

    a.    Based upon Chinook's allegations there can be no question that:

(1)    the "true information" regarding Duck Commander's control over the Robertson family's scheduling was not discussed or made a part of the License Agreement's provisions; and

(2)    this omission of "true information" by Duck Commander gained it an "unjust advantage" over  and an "inconvenience" for Chinook, because Chinook was not provided with the information necessary to allow for it to schedule the "content development steps" – which were integral to Chinook's ability to maximize the introduction of Si's Iced Tea into the market; and

(3)    this omission of "true information" by Duck Commander "influenced" Chinook's decision to sign the License Agreement, because the availability

---

[12]    *Shelton v. Standard/700 Associates*, 798 So. 2d 60, 64 (La. 2001)

of the Robertson family's personage and its attachment to Chinook's product was integral to the value Chinook placed in the License Agreement – or Chinook would have never agreed to pay Duck Commander $1,250,000 within 1½ months after it signed the License Agreement.

68.     Furthermore, *La. Civ. Code Ann., Art. 1957* provides that "Fraud need only be proved by a preponderance of the evidence and may be established by circumstantial evidence."

a.     Chinook asserts that the facts it has set forth in this Complaint clearly surpass the 'preponderance of the evidence' standard – and in most instances clearly exceed the concept of 'circumstantial evidence.'

69.     Clearly, Chinook's averments in this Complaint -- and the sworn proof that will follow as discovery unfolds in this case -- indicate Duck Commander's contractual commitments to Chinook that they would provide "content development steps" by offering the Robertson family's time to assist Chinook in the promotion of Si's Iced Tea was a 'misrepresentation.'  Even worse under Louisiana law, it represented a 'suppression of the truth' because the Robertson family did not control their time OR their calendar.    That control had been previously contracted away from Duck Commander and the Robertsons to A&E and other entities – material facts that were not mentioned in the License Agreement.

a.     That 'misrepresentation' and 'suppression of the truth' could have easily been rectified by the 'admission of the truth' and the addition of a paragraph whereby Duck Commander would agree to work with A&E and the other entities to

enable Chinook to have the opportunity to have the benefit of its 'bargain' for the Robertson's time to promote their products.

70.     Furthermore, Chinook had no way to ascertain the truth, because the contractual relationships between Duck Commander, A&E and the other entities were most certainly confidential and unavailable to Chinook.

71.     Consequently, the Chinook is entitled to damages under the Louisiana Civil Code for Duck Commander's fraudulent inducement to contract with Chinook and promise "content development steps" when, in fact, Duck Commander had no ability to honor that contractual commitment – because they had already contracted *away* that ability to other entities.

72.     Thus, if Louisiana law is to apply in this case, Chinook is entitled to an Order of this Court or should be awarded a verdict by a jury on Count III in an amount to be determined by that jury in the form of damages for their fraudulent inducement to entice Chinook to enter into the License Agreement with no ability to honor their "content development steps" which resulted in their subsequent breach of their contract with the Plaintiffs.

## COUNT IV

### COMMON LAW FRAUD UNDER THE LAW OF KENTUCKY
### and
### PUNITIVE DAMAGES RELIEF FOR THE PLAINTIFFS
### as against
### Defendant Duck Commander

73.     The allegations contained in paragraphs 1 - 72 are incorporated as if fully set forth in this Count IV.

74.     Chinook asserts that the facts detailed hereinabove clearly establish that a common law fraud, pursuant to the law of Kentucky has been conducted and perpetrated against them by Duck Commander.

75.     In Kentucky an action for common law fraud requires the party claiming it to establish six elements of fraud by clear and convincing evidence as follows: (i) a material representation, (ii) which is false, (iii) known to be false or made recklessly, (iv) made with inducement to be acted upon, (v) acted in reliance thereon and (vi) causing injury.[13]

a.     Chinook's Verified Complaint identifies misrepresentations regarding Duck Commander's control of the Robertson family's scheduling, that it knew were false at the time it made the representations and it knew the representations were deceiving Chinook.

b.     Chinook reasonably and justifiably relied on Duck Commander's representations to their detriment, as is described hereinabove, because Chinook insisted on the provisions of Schedule B of the License Agreement.

c.     Duck Commander committed this fraud and made said misrepresentations willfully, wantonly and with malicious disregard of the rights of Chinook.

d.     Chinook was in no position to ascertain the requisite knowledge to enable it to be aware of the fact that Duck Commander was not in control of its time and, as such, could not commit to personal appearances – as it did in the License Agreement.

---

[13]     *United Parcel Service Co. v. Rickert*, 996 S.W.2d 464 (Ky. 1999)

76.     As a direct and proximate result of Duck Commander's conduct, Chinook's reasonable reliance thereon, and the failure of Duck Commander to meet its obligations to Chinook, Chinook has suffered damages in an amount to be determined at trial and in a further amount to be determined at trial for additional costs, expenses and losses incurred as a result of the Duck Commander's conduct.

77.     Additionally, Chinook is entitled to receive punitive as well as compensatory damages as a result of the Duck Commander's fraudulent behavior, as described hereinabove.

78.     As a direct and proximate result of Duck Commander's conduct, Chinook's reasonable reliance thereon, and the failure of Duck Commander to meet its obligations to Chinook, Chinook has suffered damages in an amount to be determined at trial and in a further amount to be determined at trial for additional costs, expenses and losses incurred as a result of the Duck Commander's conduct.

## COUNT V

**UNJUST ENRICHMENT**
**as against**
**Go-Time Energy, LLC and Checkered Flag**
**FOR AN ACCOUNTING AS TO THEIR PROFITS**
**FROM RTDS**
**and**
**UNJUST ENRICHMENT**
**as against**
**Duck Commander**
**FOR ITS RECEIPT OF PAYMENTS FROM**
**GO-TIME ENERGY, LLC AND CHECKERED FLAG**
**FOR RTDS**

79.     The allegations contained in paragraphs 1 - 78 are incorporated as if fully set forth in this Count V.

80.     Kentucky law has historically held that a party asserting a claim for unjust enrichment must ultimately prove that (1) a benefit was conferred upon another at the party's expense; (2) the benefit resulted in appreciation by the other; and (3) the other accepted the benefit under circumstances which render its retention without payment inequitable. *Guarantee Electric Co. v. Big Rivers Electric Co.,* 669 F.Supp. 1371, 1380-1 (W.D.Ky. 1987)

a.     A benefit has been conferred upon Go-Time and Checkered Flag by reason of the fact that they have been granted a license agreement to sell RTDs (Go-Time being energy drinks and Checkered Flag being vitamin water) which violated Chinook's pre-existing and specific exclusive License Agreement with Duck Commander.

b.     This benefit conferred upon Go-Time and Checkered Flag has clearly benefited both companies.

c.     Lastly, there can be no question that if the benefit conferred upon Go-Time and Checkered Flag is retained by them, that the result will be inequitable to Chinook.

81.     With regard to Duck Commander, it has been unjustly enriched by the receipt of payments from both Go-Time and Checkered Flag for Duck Commander's endorsement of their products, based upon an invalid license agreement with both companies – because Duck Commander had no right to enter into such a license agreement without an amendment to the Chinook License Agreement, pursuant to ¶22 therein.

82. As a direct and proximate result of Duck Commander's conduct, Chinook's reasonable reliance thereon, and the failure of Duck Commander to meet its obligations to Chinook. Consequently, Chinook has suffered damages in an amount to be determined at trial and in a further amount to be determined at trial for additional costs, expenses and losses incurred as a result of the Duck Commander's conduct.

a. To aid Chinook in ascertaining the damages prayed for in ¶82, the Court is asked to issue an Order for an accounting of Go-Time and Checkered Flag to ascertain the profits gained by Go-Time and Checkered Flag as a result of their improperly granted license in violation of Chinook's exclusive License Agreement; and

b. To aid Chinook in ascertaining the damages prayed for in ¶82, the Court is asked to issue an Order for an accounting of Duck Commander to ascertain the amount of money it has received from Go-Time and Checkered Flag in the form of royalty payments or sponsorship payments of any kind, character or description.

**COUNT VI**

**CIVIL CONSPIRACY**
**relating to**
**TORTUOUS INTERFERENCE WITH CONTRACTUAL RELATIONSHIP**
**as against**
**Duck Commander and Checkered Flag**

83. The allegations contained in paragraphs 1 - 82 are incorporated as if fully set forth in this Count VI.

**Civil Conspiracy in law of Kentucky and Louisiana**

84. Under Kentucky law a civil conspiracy is a recognizable claim that has been defined as a "... corrupt or unlawful combination or agreement between two or more persons to do by concert of action an unlawful act, or to do a lawful act by unlawful

45

means." *Smith v. Board of Education*, 94 S.W. 2d 321, 325 (Ky. 1936) "In order to prevail on a claim of civil conspiracy, the proponent must show an unlawful/corrupt combination or agreement between the alleged conspirators to do by some concerted action an unlawful act." *Montgomery v. Milam,* 910 S.W.2d 237, 239 (Ky. 1995)[14]

      a.      Furthermore, there is even more recent Kentucky case law recognizing the validity of a civil conspiracy claim in Kentucky. [15]

85.      Under Louisiana law the Louisiana Civil Code Article 2324(A) provides that "[h]e who conspires with another person to commit an intentional or willful act is answerable, in solido, with that person, for the damage caused by such act."

      a.      In *Louisiana v. Guidry*, 489 F.3d 692 (5th Cir. 2007), the U.S. Court of Appeals for the Fifth Circuit has recently affirmed the application of Article 2324(A) of the Louisiana Civil Code provided the claim of civil conspiracy involves an underlying tort.

86.      Therefore, the law of both Kentucky and Louisiana recognize the concept of a civil conspiracy, but it must be associated with an underlying tort.

### Tortuous Interference with Contractual Relationship in Kentucky and Louisiana

87.      To establish a tortuous interference with a contractual relationship count Kentucky courts rely upon the Restatement (Second) of Torts by requiring the following elements to be proven: (1) the existence of a valid contract, business relationship or

---

[14]      See also: *Peoples Bank of Northern Kentucky, Inc. v. Crowe Chizek & Co., LLC*, 277 S.W.3d 255, 260-1 (Ky. App. 2008)

[15]      See: *Fastenal Co. v. Greg Crawford, et.al.*, 609 F.Suupp.2d 650 (E.D.Ky., Feb. 16, 2009). In *Fastenal* Judge Thapar cited to *James v. Wilson*, 95 S.W.3d 873 (Ky.Ct.App. 2002); *Nat'l Info. & Comm.Equip Network, Inc. v. Willigan*, 2007 U.S. Dist. LEXIS 75799 (E.D.Ky. Oct. 11, 2007); and *Stonestreet Farm, LLC v. Buckram Oak Holdings, NV*, 2007 U.S.Dist. LEXIS 31313 (E.D.Ky. Apr. 16, 2007)

business expectancy; (2) the defendant's knowledge of the same; (3) an intentional act of interference that causes the breach of that contract or inhibits a prospective contract; and (4) an improper motive or lack of justification for the interference. [16]

88.     In determining whether an actor's conduct in intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the following factors:

    a.     the nature of the actor's conduct,

    b.     the actor's motive,

    c.     the interests of the other with which the actor's conduct interferes,

    d.     the interests sought to be advanced by the actor,

    e.     the social interests in protecting the freedom of action of the actor and the contractual interests of the other,

    f.     the proximity or remoteness of the actor's conduct to the interference and

    g.     the relations between the parties.

89.     Kentucky courts give significant weight to the defendant's motive or purpose when balancing these factors. [17] A trier of fact shall infer a malicious motive if the defendant lacks proof or justification. [18]

90.     The Supreme Court of Louisiana has recognized the tort of Intentional Interference with Contractual Relationship where a corporate officer intentionally causes his own corporation to breach the corporation's contract with the complaining party. [19]

---

[16]     See: *Ventas, Inc., v. Health Care Property Investors, Inc.,* 635 F.Supp. 2d 612 (W.D.Ky. 2009)

[17]     *Butler v. Progressive Cas. Ins. Co.,* 2005 WL 1009621 (W.D. Ky.) (Citing *NCAA v. Hornung,* 754 S.W.2d at 859)

[18]     *Id.*

[19]     *9 to 5 Fashions, Inc. v. Spurney,* 538 So. 2d 228 (La. 1989)

91.     The Louisiana Supreme Court established five elements for liability to be imposed: "(1) the existence of a contract or a legally protected interest between the plaintiff and the corporation (defendant); (2) the corporate officer's knowledge of the contract; (3) the officer's intentional inducement or causation of the corporation to breach the contract or his intentional rendition of its performance impossible or more burdensome, (4) the absence of justification on the part of the officer and (5) causation of damages to the plaintiff by the breach of the contract or difficulty of its performance brought about by the officer." [20]

a.     The Court's holding was grounded in Louisiana Civil Code Article 2315.

b.     The holding in *Spurney* (See: Footnote 19) has been affirmed by the Court of Appeals of Louisiana, Third Circuit on December 10, 2014 in *Tolliver v. Bob Broussard, et.al.* 14-738 (La.App. 3 Cir. 12/10/14); 2014 La. App. LEXIS 2942

92.     As a direct and proximate result of the civil conspiracy between Duck Commander and Checkered Flag and the resultant tortuous interference of Chinook's License Agreement by Duck Commander and Checkered Flag, Chinook has suffered material and substantial damages, including *inter alia*, the $1,750,000 it has paid to Duck Commander as set forth in ¶24 above and the additional financial loss it has experienced all totaling in excess of $4,500,000. The exact amount of Chinook's financial loss as a result of Duck Commander's and Checkered Flag's tortuous interference will be determined at the trial of this case including additional costs, expenses and losses incurred as a result of the breach and the requirement to enforce its breach in court.

---

[20]     *Id.* at 234.

## COUNT VII

### CIVIL CONSPIRACY
#### relating to
### TORTUOUS INTERFERENCE WITH BUSINESS OPPORTUNITY
#### as against
#### Duck Commander and Checkered Flag

93.     The allegations contained in paragraphs 1 - 92 are incorporated as if fully set forth in this Count VII.

94.     In Kentucky, to recover for tortious interference with a prospective business opportunity, the plaintiff must show (1) the existence of a valid business relationship or its expectancy; (2) the defendant's knowledge thereof; (3) the defendant's intentional act of interference; (4) an improper motive on the part of the defendant; (5) causation; and (6) special damages.

      a.     the interference must be improper. *Nat'l Collegiate Athletic Ass'n v. Hornung,* 754 S.W.2d 855, 857 (Ky. 1988*)*

      b.     The showing of malice or some significantly wrongful conduct is evidence of improper conduct. *Id. at 859*

      c.     Malice may be inferred where the interference lacks justification. *Id.; see also Bourbon County Joint Planning Comm'n v. Simpson,* 799 S.W.2d 42 (Ky. App. 1990*)* ("malice must be shown, but only in the sense of lack of justification for the interference.").

      d.     Under Kentucky law, significantly wrongful conduct certainly includes fraudulent misrepresentation, deceit, coercion, threats of illegal conduct, and physical violence, which are specifically highlighted as improper acts. *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.,* 807 S.W.2d 476, 487 (Ky. 1991)

49

95.     Louisiana law requires the same elements as Kentucky as well as a similar showing of malice on the part of the defendant actor. [21]

96.     As a direct and proximate result of the civil conspiracy between Duck Commander and Checkered Flag and the resultant tortuous interference of Duck Commander and Checkered Flag with Chinook's business opportunity that was created by Chinook's License Agreement with Duck Commander, Chinook has suffered material and substantial damages, including *inter alia*, the $1,750,000 it has paid to Duck Commander as set forth in ¶24 above <u>and</u> the additional financial loss it has experienced all totaling in excess of $4,500,000.  The exact amount of Chinook's financial loss as a result of Duck Commander's and Checkered Flag's tortuous interference will be determined at the trial of this case including additional costs, expenses and losses incurred as a result of the breach and the requirement to enforce its breach in court.

December 29, 2014

Respectfully submitted,

_____/s/_____

J. Bruce Miller
**J. BRUCE MILLER LAW GROUP**
Waterfront Plaza, 20th Floor
325 W. Main St.
Louisville, Kentucky 40202
Ph. 502-587-0900
Fx. 502-587-7756
*Counsel for Chinook USA, LLC*

---

[21]     *Dussouy v. Gulf Coast Investment Corp* 660 F.2d 594 (5th Cir. 1981) formulated the rationale for the tort that has been adopted by most later courts: "Louisiana law protects the businessman from 'malicious and wanton interference,' permitting only interferences designed to protect a legitimate interest of the actor." *Id.* at 601 The Dussouy court clearly stated that "malice is a necessary element of the cause of action," *Id.* at 602 and later courts have consistently required a showing of actual malice.

## VERIFICATION

I, Paul Cox, Chairman of the Board and Chief Operating Officer of Chinook, state that I have read the above and foregoing Verified Complaint and aver under my solemn oath that the statements contained therein are true to the best of my knowledge and belief.

_____
Paul Cox

Subscribed and sworn to before me by Paul Cox on this the 29th day of December 2014.

COMMONWEALTH OF KENTUCKY    )
                                 )

COUNTY OF JEFFERSON            )

_____
Notary Public, Kentucky State at Large